UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 AUG 26  PM 4: 07

CLERK

BY_____
DEPUTY CLERK

ALFRED GEORGE ANAIR,  )
      )
        Plaintiff,  )
      )
  v.    )   Case No. 2:14-cv-169
      )
CAROLYN W. COLVIN,    )
Acting Commissioner of Social Security,  )
      )
        Defendant.  )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR
JUDGMENT REVERSING THE DECISION OF THE COMMISSIONER
AND DENYING DEFENDANT'S MOTION FOR ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER**
(Docs. 8 & 12)

Plaintiff Alfred George Anair is a claimant for Social Security Disability

Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") under the

Social Security Act. He brings this action pursuant to 42 U.S.C. § 405(g) to reverse the

decision of the Social Security Commissioner that he is not disabled. Plaintiff filed his

motion (Doc. 8) on December 29, 2014, and the Commissioner filed her motion to affirm

(Doc. 12) on March 30, 2015. Plaintiff submitted his reply brief on April 19, 2015.

(Doc. 15.) The appeal was reassigned on June 9, 2015 (Doc. 16), at which time the court

took the matter under advisement.

Plaintiff is represented by Arthur P. Anderson, Esq. The Commissioner is

represented by Assistant United States Attorney Monika K. Crawford.

**I.    Procedural History.**

Plaintiff filed for DIB and SSI in July 2011. His claims were originally denied on

September 7, 2011, and upon reconsideration on November 18, 2011. Plaintiff timely

requested a hearing, which was held on January 3, 2013, before Administrative Law

Judge ("ALJ") Dory Sutker. Plaintiff appeared with counsel, and Plaintiff and vocational expert Howard Steinberg testified. On February 11, 2013, ALJ Sutker issued a written decision finding Plaintiff was not disabled under the Social Security Act. Plaintiff timely requested review, and on June 4, 2014, the Appeals Council denied Plaintiff's request for review, making ALJ Sutker's February 11, 2013 decision the Commissioner's final decision. Plaintiff timely filed the present action, and his claim is ripe for judicial review pursuant to 42 U.S.C. § 405(g).

## II.    Factual Background.

Plaintiff is a forty-two year old man. He alleges a disability onset date of February 14, 2010, resulting from an injury to his left eye and related symptoms. Plaintiff is left-handed and left-eye dominant. Plaintiff completed schooling through the ninth grade, thereafter attained his G.E.D. Plaintiff's past work included an assembler of railroad cars, a carpenter, and a logger.

### A.    Plaintiff's Physical and Mental Health Treatment History.

On February 14, 2010, Plaintiff was working at home on a machine battery when it exploded. His vision immediately "went black." (AR 414.) He was first treated by Dr. Stephen Phipps, of Eye Associates of Northern New England, who observed "an open wound" in Plaintiff's left eye. *Id.* A CT scan revealed an "intraocular foreign body." *Id.* Dr. Phipps sent Plaintiff to the Dartmouth-Hitchcock Medical Center ("DHMC") for further treatment, at which time Plaintiff reported aching in his left eye with a pain level of an eight out of ten. He noted, however, that his vision had returned "slightly." *Id.* He underwent two surgeries at the DHMC based on a primary diagnosis of a "ruptured globe" and a secondary diagnosis of "traumatic cataract, vitreous hemorrhage, an intraocular foreign body, peripapillary subretinal hemorrhage, choroidal hemorrhage, [and] retinal dialysis." (AR 410.) DHMC reported Plaintiff "did well with first surgery [for] repair of ruptured globe" and "tolerated" the second surgery to remove the foreign object, but thereafter had nausea, vomiting, and pain. *Id.*

On March 3, 2010, Plaintiff saw Dr. Christopher Chapman for a post-operative evaluation. Plaintiff reported pain in his left eye rated by him as a seven out of ten on

2

average but that he was "having significant time during each day in which there was near complete relief." (AR 407.)  While he reported that he experienced "some photopsias in his peripheral vision," he listed no other symptoms involving his left eye.  *Id.*  Dr. Chapman noted that Plaintiff's primary concern was pain management and that Plaintiff interrupted him "at each and every step in the patient encounter regarding pain management and other eye care concerns."  *Id.*  Noting that Plaintiff was "consumed with the issue regarding pain management," Dr. Chapman assessed subjective complaints of pain, as well as minimal inflammation.  (AR 408.)  Dr. Chapman explained to Plaintiff that his pain following "such an extensive injury" would be "significant and frustrating" but that his Vicodin prescription should be sufficient to treat his pain over the next week. *Id.*  Plaintiff informed Dr. Chapman after the visit that he preferred to see Dr. Phipps, the physician who had first treated Plaintiff immediately after his injury.

On March 11, 2010, Plaintiff visited Dr. Michelle Young at the Retina Center of Vermont.  Plaintiff reported "aching in the [left] eye when he trie[d] to work at seeing"; that his vision was "not good"; that he could see a gas bubble in his eye; that his symptoms were constant, with flashing at times; and that his pain was improving.  (AR 400.)  Dr. Young's examination revealed Plaintiff's left eye showed no signs of infection, threatening pressure, retinal detachment, or other major complications.  She noted, however, that his left eye lens and aspects of his cornea were "irregular."  (AR 404.)  She advised Plaintiff to limit himself to "light physical activity" and to call if he experienced increasing discomfort that was not relieved by Tylenol or a comparable over-the-counter pain medication.  (AR 405.)

On March 25, 2010, Plaintiff returned to Dr. Young, reporting "that if he let[] eye 'hang' he [could] see through bubble," with flashing that "comes and goes," but that his pain was "getting better" and there was "no pain in eye."  (AR 392, 395.)  Dr. Young's examination of Plaintiff's eye yielded observations similar to those she noted on March 11, with the exception that his left eye vision improved to 20/160.

On March 16, 2010, Plaintiff saw his primary care physician, Dr. Mark Lichtenstein.  At that time, Plaintiff was using "minimal pain pills," could not lift over

twenty pounds, and could "feel[] it in his eye" when he tried to lift "something heavy." (AR 549.) Dr. Lichtenstein examined Plaintiff's eye and found no cloudiness, active inflammation, or discharge and that "everything look[ed] fairly calm." *Id.* He noted, however, that Plaintiff was "essentially completely blind in his left eye" and that Plaintiff kept his "eyelid closed most of the time" because he was not able to "open it wide." *Id.* Dr. Lichtenstein opined that Plaintiff would be "unable to work" for the following six months and "from then on [he] would hope [Plaintiff] would be able to work." *Id.*

On April 22, 2010, Plaintiff saw Dr. Young at the Retina Center. He reported "not a lot of pain," but that using his left eye caused increased pain and headaches, that driving was "a bit difficult," and that he was scared to work on staging. (AR 384, 387.)

Plaintiff returned to Dr. Lichtenstein on May 25, 2010, reporting his pain was controlled but that he still was not able to return to work and that he was experiencing a lot of anxiety and fear when, for example, working from a roof or in the woods. Dr. Lichtenstein noted that Plaintiff's left eye was "shut nearly all the time" and that Plaintiff could only "make out fuzziness of figures" and "some colors." (AR 585.) Dr. Lichtenstein concluded Plaintiff had not "adapted to one-eye living" and was "still disabled" since he could not work. *Id.*

On June 3, 2010, Plaintiff saw Dr. Young, complaining that his left eye was "[m]ore light sensitive," that he had no depth perception, that he tried to keep his left eye closed entirely "due to distortion" and constant headaches, and that he could not function with his left eye open because "[e]verything" was constantly a "smear." (AR 376, 379-80.)

Four days later, Plaintiff saw Dr. Phipps, who noted Plaintiff was "stable from a retinal standpoint" and was taking no medications. (AR 451.) Dr. Phipps observed irregularities on examination of Plaintiff's left eye and that his left eye vision was 20/400 uncorrected and 20/50 corrected. Dr. Phipps requested a consultation with the Ophthalmic Consultants of Boston, and Plaintiff underwent a consultation with Dr. Nicoletta Fynn-Thompson on July 21, 2010, to discuss surgery options. At that time, Plaintiff reported decreased vision and significant symptoms of glare. Dr. Fynn-

4

Thompson noted Plaintiff's left eye vision was 20/400 uncorrected and 20/80 corrected. She also observed that his iris was "completely missing," which precluded reconstructive surgery of his pupil. (AR 447, 731.)

In July through September of 2010, Plaintiff saw Dr. Lichtenstein. In July, Dr. Lichtenstein determined that Plaintiff was "unable to have binocular vision" [1] and that his vision in his left eye was still "seriously compromised" from his injury. (AR 666.) He noted Plaintiff had residual pain and dizziness and remained unable to return to work as a logger or laborer.

On August 3, 2010, Plaintiff reported that he experienced pain and pressure when leaning over, had no binocular vision, was "having a hard time" and "a lot of fatigue," and was unable to drive and do his regular work in the woods. (AR 582.) Dr. Lichtenstein determined that Plaintiff was "functionally blind" in his left eye, was "unable to return to normal work," and was at that time unable to adjust to his loss of vision in order to apply to a "menial job." *Id.*

On August 17, 2010, Dr. Lichtenstein offered the same assessment that Plaintiff was unable to work and remained "functionally blind." (AR 580.) He observed that Plaintiff's left pupil appeared "abnormal" and that Plaintiff was better off not using his left eye because use disrupted his depth perception. *Id.* Plaintiff reported significant fatigue and some pain, but Dr. Lichtenstein believed this pain did not warrant a prescription. He encouraged Plaintiff to try occupational therapy because Plaintiff had not yet "adapted to his present vision problem." *Id.*

On September 8, 2010, Dr. Lichtenstein again noted Plaintiff was unable to return to "regular work"; however, he also noted that Plaintiff's pain was "completely abated," that he was not taking pain medication, and that he would be able to return to work in December 2010. (AR 578.) Dr. Lichtenstein observed that Plaintiff's left iris was abnormal and that his pupil was irregular and non-reactive.

---

[1] Binocular vision means "[a]dapted to the use of both eyes," in contrast to monocular vision, which means "affecting" or "visible by one eye only." Stedman's Medical Dictionary 219, 1223 (28th ed. 2006).

Following consultation with Dr. Fynn-Thompson and Dr. Lichtenstein, Plaintiff underwent surgery on September 14, 2010 to implant a secondary intraocular lens and to remove a conjunctival cyst from his left eye. Plaintiff left the operation in "satisfactory condition" (AR 712), but reported feeling like he "got shot in the head" in the week following the surgery. (AR 761.) Plaintiff thereafter followed up in October 2010 with both Dr. Fynn-Thompson and Dr. Lichtenstein, reporting to Dr. Fynn-Thompson that his vision, balance, and depth perception had "slightly improved." (AR 446.) He further reported, however, that his "terrible headaches" continued even after the surgery and that he had a headache for the previous two or three days. (AR 698; *see also* Doc. 8-1 at 10 & n.4.) Dr. Fynn-Thompson noted Plaintiff's left eye vision was 20/100 uncorrected and 20/70 corrected, and she recorded borderline intraocular pressure, a trace residual conjunctival infection, and vitreous hemorrhage of Plaintiff's left eye.

During this same time period, Dr. Lichtenstein observed that Plaintiff's left eye looked "much better than before" but with some irregularity and a small cyst on the cornea. (AR 575.) Plaintiff reported that he felt pressure in his left eye if he lifted something heavy, and Dr. Lichtenstein noted Plaintiff continued to have sensitivity to lifting, pressure, and pain in his left eye that was controlled with "minimal" medicine. *Id.* Dr. Lichtenstein recorded that Plaintiff was on "half-duty" and was released to lift over ten pounds, but no more than twenty pounds. *Id.* Dr. Lichtenstein determined that Plaintiff had "no functional vision" without the use of his right eye, that he was currently unable to return to his prior work as a logger, and that he would not be able to return to heavy work before April 2011. *Id.*

On November 10, 2010, Plaintiff followed up with Dr. Fynn-Thompson. He reported no improvement in vision from the October visit but noted that his balance was slightly better. Dr. Fynn-Thompson recorded that Plaintiff's vision remained 20/100 uncorrected in the left eye.

On November 29, 2010, Plaintiff saw Dr. Phipps. Plaintiff reported that he was "off balance" and experienced headaches that started over his left eye, occurred two to three times per week, and lasted two days. (AR 440.) That same week, Plaintiff returned

6

to Dr. Young at the Retina Center.  He reported that his vision was "like looking through wax paper" but was "better than it was."  (AR 368.)  He further reported "bad headaches from his eye," no depth perception, and that he had a "very hard time with glare" and was "[m]ore light sensitive."  (AR 368, 371.)  Dr. Young noted that the iris of Plaintiff's left eye was "irregular" and that he kept his left eye "closed."  (AR 369, 372.)

On December 9, 2010, Plaintiff saw Dr. Lichtenstein, reporting that he could not return to regular work or do any physical work because of pain in his left eye when he worked or put his head down.  Plaintiff further reported that he did not have binocular vision but that his reading ability had improved.  Dr. Lichtenstein's examination revealed that Plaintiff's left pupil was "grossly abnormal" with an "odd" color.  (AR 573.)  Dr. Lichtenstein determined that Plaintiff's left eye was "functionally blind."  *Id.*  Dr. Lichtenstein also determined that Plaintiff could lift only ten to fifteen pounds and was unable to bend over regularly due to pressure in his eye, which precluded work as a logger.  He noted that he hoped Plaintiff could return to his regular work by the end of March of 2011, and that Plaintiff should "slowly progress" in the interim.  *Id.*

On January 17, 2011, Plaintiff returned to Dr. Phipps, complaining that his left eye "ache[d]" in the cold, but that he felt "a lot better," which he attributed to the fact that he had mostly stayed inside since his last visit with Dr. Phipps.  (AR 436.)  He informed Dr. Phipps he was going to return to logging the next day.  He followed up with Dr. Phipps on January 19, 2011, because he had experienced eye pain and throbbing after logging the previous day that had improved by that morning.  He described to Dr. Phipps that he saw red "a lot" and that the cold "really" bothered him.  (AR 434.)  He believed that his left eye "seem[ed]" fine if he did not "do anything" but "everything" seemed to bother it.  *Id.*  He followed up again with Dr. Phipps on January 24, 2011, reporting throbbing pain, seeing red "more constant[ly]," that the cold bothered him, that he had to take medication for the pain, and that he could not drive.  (AR 432.)  Dr. Phipps recommended that Plaintiff return to see Dr. Fynn-Thompson.

On January 31, 2011, Plaintiff saw Dr. Fynn-Thompson and told her that he experienced "significant pain" after returning to work, decreased vision as a result of the

pain, and seeing "red" at night. (AR 462.) He reported using pain medication to treat his "excruciating" symptoms. *Id.* Dr. Fynn-Thompson diagnosed ocular surface irritation due to dry eye that developed during the day and glaucoma in the left eye due to damage that was stable on his current medication. She believed that Plaintiff was "doing well" following his surgery, although she noted Plaintiff's left eye vision was 20/100 uncorrected. *Id.* She prescribed Restasis twice a day and advised Plaintiff to use Systane Balance six times a day and to continue his glaucoma drops.

On February 3, 2011, Plaintiff saw Dr. Peter Sher.[2] Dr. Sher noted that Plaintiff had returned to work but saw red out of his left eye and developed intense pain while working. Plaintiff reported taking 20 mg of narcotic pain medication for "excruciating" pain that would develop after three to four hours of work. (AR 571.) Plaintiff also reported feeling depressed because he wanted to return to full time work but he could not due to the pain. Dr. Sher noted that Plaintiff "became tearful" when describing his inability to work, and Dr. Sher diagnosed possible depression. *Id.* Dr. Sher also opined that Plaintiff was "disabled," stemming from complications with his left eye, and that Plaintiff should not lift "anything." *Id.*

On February 7, 2011, Plaintiff saw Dr. Phipps. Plaintiff reported reduced redness in vision and "feeling ok" because he had not worked since his last visit. (AR 430.) Plaintiff followed up with Dr. Phipps on February 21, 2011, reporting no pain or redness in his vision but that the surface of his left eye did not feel "'quite right.'" (AR 428.) He stated that he was taking "it easy a lot" and was not working, which he thought contributed to his improved symptoms. *Id.*

On February 24, 2011, Plaintiff returned to Dr. Sher, who noted that Plaintiff was experiencing consistent pain in his left eye when exposed to wind or cold or when lifting. Plaintiff further described decreased "visual acuity" when he worked that would take days thereafter to return to normal. (AR 568.) Plaintiff stated that he tried multiple times to return to work but that work caused left eye pain that necessitated taking 20 to 30 mg of Hydrocodone. Dr. Sher noted that Plaintiff's left pupil could not constrict to block out

---

[2] It appears that Dr. Sher works in the same practice as Dr. Lichtenstein.

8

sunlight and that his left eye was "grossly abnormal" with no retina and no reaction to light. *Id.* Dr. Sher again expressed his belief that Plaintiff was "disabled," noting that Plaintiff could return to his previous occupation only by treating his pain with narcotic medications, which were dangerous to use in that occupation and which exposed Plaintiff to "addiction risks." *Id.* Dr. Sher indicated he would support Plaintiff's application for disability and vocational training.

In February 2011, Dr. Phipps requested that Plaintiff follow up with Dr. Fynn-Thompson because of Plaintiff's "intermittent aching and pain" and "red vision" that "seemed to be directly related to the amount of work" Plaintiff tried to do. (AR 681.) On March 14, 2011, Plaintiff followed up with Dr. Fynn-Thompson. Plaintiff reported that, since his last visit, he had not been working as a logger, had not been taking pain medication, and had experienced no pain or discomfort, except for "a mild pressure sensation on the left eye." (AR 678.) He also described feelings of "heaviness" and "cl[o]udiness." (AR 675.) Dr. Fynn-Thompson noted significantly elevated intraocular pressure in the left eye, and she again diagnosed glaucoma due to damage. She noted Plaintiff had "photophobia."[3] (AR 675.) She also diagnosed surface irritation and dry eye as the source of his discomfort in his left eye and that exposure in the work environment was a factor causing irritation, noting that Plaintiff confirmed that his symptoms were worse when outside and over the course of the day. For this reason, Dr. Fynn-Thompson supported vocational training so Plaintiff was not "prone to have so much exposure" to irritants. (AR 679.) She continued his current medications and prescribed an additional medication to reduce intraocular pressure.

On April 1, 2011, Plaintiff saw Dr. Krista Haight, who practices with Dr. Phipps. Dr. Haight noted Plaintiff was "very photophobic" and was experiencing red vision and

---

[3] Photophobia, or photalgia, refers to "[l]ight-induced pain, especially of the eyes." Stedman's Medical Dictionary 1489, 1490 (28th ed. 2006); *see also Matts v. Barnhart*, 2007 WL 187688, at *2 n.5 (S.D.N.Y. Jan. 22, 2007) ("Photophobia is 'abnormal visual intolerance to light.'") (quoting Dorland's Illustrated Medical Dictionary 1287 (27th ed. 1988)).

pain in his left eye. (AR 826.) Plaintiff then saw Dr. Phipps on July 18, 2011,[4] at which time Plaintiff described that he was "getting really light sensitive" and that this caused him to spend most of his time inside and in the dark. (AR 419.) He again reported that lowering his head and that working, bending, or lifting for one hour caused aching and pounding in his eye that subsided after one or two hours if he rested. Plaintiff treated his pain with Hydrocodone. Plaintiff returned to Dr. Phipps on August 8, 2011, reporting that his left eye felt "heavy" and "worse" with activity and that he noticed no change while taking Restasis. (AR 416.)

On September 28, 2011, Plaintiff saw Dr. Lichtenstein. Plaintiff reported that "too much light" caused pain and "'red' vision where everything look[ed] intensely red." (AR 564.) Plaintiff explained that, if he tried to wear an eye patch over his left eye, the eye dried out and became "achy and sore and uncomfortable." *Id.* The Restasis prescribed for dry eye did not make a difference for Plaintiff. Plaintiff described his discomfort as constant and as occurring even when sedentary and inside. Dr. Lichtenstein's examination revealed the left eye was abnormal with a "nonfunctional iris." *Id.* While he noted Plaintiff had good energy, could take walks and do things outside, and could complete activities of daily living, he noted any outside activity caused eye pain and that Plaintiff could not safely drive for any length of time as it involved exposure to bright lights. Dr. Lichtenstein also noted that Plaintiff used to work outside but could not return

---

[4] In a letter dated July 26, 2011, Dr. Phipps explained Plaintiff's condition and treatment since the February 2010 injury as follows:

> [H]e has issues with elevated pressure in the eye which has been controlled with topical drops as well as chronic inflammation inside the eye. These problems in combination with the fact that there is no iris tissue to block light has resulted in extreme light sensitivity and photophobia. The elevated intraocular pressure can be exacerbated by bending and lifting and can cause eye ache and headache. In addition, the lack of iris tissue exposes him to a significant amount of light which can lead to a condition called erythropsia or "red vision." He has experienced this as well. We are trying to keep his intraocular pressure and intraocular inflammation under control with eye drops, and he is slowly getting getter although does have significant disability due to his symptoms.

(AR 418.)

to that work because wind and air caused discomfort. He therefore recommended that Plaintiff attend vocational training to find work "at home part-time, a little bit at a time, out of the sun and out of the wind that just use[d] his one good eye and his ability to fix things." *Id.*

Plaintiff returned to Dr. Lichtenstein on November 9, 2011, for bronchitis. Plaintiff reported experiencing chronic pain, dryness, and soreness in his left eye that impacted his ability to do "any kind of work." (AR 864.) Plaintiff explained that his left eye was "very sensitive to light and to any covering" and that covering it caused pain and dryness. *Id.* Dr. Lichtenstein diagnosed depression and post-traumatic stress disorder, that also impacted Plaintiff's energy levels, and he referred Plaintiff to a psychologist for therapy to help him adjust to his loss of vision and loss of income for his family.[5] That same week, Plaintiff reported to Dr. Phipps that he experienced aching and light sensitivity and that Restasis had not improved his discomfort. Dr. Phipps discontinued Restasis at that time, and he noted that Plaintiff was "very photophobic." (AR 854.)

Plaintiff returned to see Dr. Phipps on March 9, 2012, reporting continued light sensitivity, and on July 23, 2012, reporting "increased" light sensitivity, particularly in sunlight, as well as pain in his left eye. (AR 849.) He explained that "increased" activity caused nausea and pressure in his eye, *id.*, and that the only time he did not experience pain or aching was when he was not in the light or "trying to work." (AR 852.)

Plaintiff returned to Dr. Lichtenstein on August 10, 2012, and reported continued struggling with his left eye. He described chronic pain and "some kind of flare" in the left eye, and he complained that any light impacted his vision. (AR 860.) Plaintiff explained that his right eye had been impacted as well and that he still had not been able to function or work. Plaintiff informed Dr. Lichtenstein that he had not been taking Hydrocodone, but that marijuana had been helpful. He requested a prescription for medical marijuana, which Dr. Lichtenstein approved. Dr. Lichtenstein also suggested vocational retraining for light work. Dr. Lichtenstein noted that they sat in a darker room

---

[5] Plaintiff began treatment with Dr. Larry Kart in December 2011 that continued through November 2012.

because the light really bothered Plaintiff's left eye.  Dr. Lichtenstein also noted that
Plaintiff's use of his left eye use was "minimal."  *Id.*

## B.    Treating Sources' Physical Assessments of Plaintiff.

On August 8, 2012, Dr. Lichtenstein completed a residual functional capacity
("RFC") evaluation for Plaintiff.  He diagnosed eye trauma that caused chronic facial
pain and distorted vision.  He listed Plaintiff's limitations as "functional vision with one
eye and limited to indoor lighting" that was exacerbated by bending and lifting heavy
objects (greater than fifty pounds) and that was distorted by sunlight and flashes.  (AR
843.)  He indicated that Plaintiff would "often" experience pain and other symptoms
severe enough to interfere with attention and concentration.  *Id.*  He also noted that
Plaintiff would need to take a break for fifteen minutes every hour during an eight-hour
workday and that Plaintiff would be absent from work approximately twice a month as a
result of his limitations.

On September 21, 2012, Dr. Phipps completed a RFC evaluation for Plaintiff.  He
diagnosed Plaintiff's left eye with stable pseudophakia;[6] stable traumatic aniridia;[7]
secondary glaucoma, which was stable with treatment; and chronic low-grade uveitis and
keratopathy.[8]  He listed associated symptoms to include "[d]ebilitating glare due to
aniridia" and "severe photophobia."  (AR 845.)  He described Plaintiff's limitations as
decreased left eye vision, with decreased depth perception, and a loss of accommodation
due to pseudophakia.  He indicated that Plaintiff could not tolerate bright light or normal
lighting conditions due to severe photophobia caused by the absence of the iris, low-
grade uveitis, and keratopathy, including severe symptoms of glare from sunlight,

---

[6] Pseudophakia means "[a]n eye in which the natural lens is replaced with an intraocular lens."
Stedman's Medical Dictionary 1592 (28th ed. 2006).

[7] Aniridia is the absence of the iris.  *See* Stedman's Medical Dictionary 94 (28th ed. 2006).

[8] Uveitis is an inflammation of the uveal tract.  *See* Stedman's Medical Dictionary 2079 (28th ed.
2006).  Uvea is the vascular layer of the eyeball, which includes the pupil and the iris, which in
turn functions as a diaphragm with sphincter and dilator muscles.  *See id.* at 1000, 2079.
Keratopathy refers to any disease, damage, dysfunction, or abnormality of the cornea.  *See id.* at
1025.

headlights, and streetlights. He determined that dusty, dry, or windy conditions would exacerbate Plaintiff's conditions. He predicted that Plaintiff would "constantly" experience pain and other symptoms severe enough to interfere with attention and concentration, that Plaintiff would "constantly" need to take unscheduled breaks of an unknown length during an eight-hour workday, and that Plaintiff would be absent from work more than four times a month as a result of his condition. (AR 845-46.) He added the following notation: "From my experience with this patient, his symptoms are too debilitating to perform work of any kind." (AR 846.)

### C.    State Consultants' Physical Assessments of Plaintiff.

In September 2011, Margie Morley, identified as a single decision maker, completed a physical RFC assessment based on Plaintiff's medical record as part of the original determination that Plaintiff was "[n]ot [d]isabled." (AR 90.) She listed Plaintiff's exertional limitations based on pressure in his left eye as follows: Plaintiff could occasionally lift and/or carry ten pounds; could frequently lift and/or carry less than ten pounds; could push and pull without limitation; and could stand, walk, and sit with normal breaks for a total of more than six hours on a sustained basis in an eight-hour workday. She found no manipulative limitations, no communicative limitations, and no postural limitations, except that Plaintiff could never climb ladders, ropes, and scaffolds, based on pressure in his left eye and loss of depth perception. She listed Plaintiff's visual limitations in his left eye as including limitations in near and far acuity, depth perception, accommodation, color vision, and field of vision. She noted Plaintiff had "very little use of left eye." (AR 70.) She found environmental limitations that required Plaintiff to avoid even moderate exposure to hazards, fumes, odors, dusts, gases, and poor ventilation due to dryness, irritation, pain, and decreased vision in Plaintiff's left eye.

In November 2011, Dr. Geoffrey Knisely reviewed Plaintiff's medical record to complete a second physical RFC assessment as part of reconsideration of Plaintiff's application for benefits. Upon reconsideration, he found Plaintiff to be "[n]ot [d]isabled." (AR 107.) Dr. Knisely confirmed the limitations listed in Ms. Morley's

September 2011 RFC assessment, with the exception that Dr. Knisely found Plaintiff could frequently lift and/or carry ten pounds.

### D.    Assessments of Plaintiff's Mental Limitations.

In August 2011, Plaintiff was examined by a consultative psychologist, Jason Fechter.  Plaintiff reported that he relived the accident causing his left eye injury every day.  A year after the accident, Plaintiff reported that he had attempted to return to work but experienced "incredible" pain that necessitated taking "a lot" of pain killers.  (AR 831.)  He reported that he experienced severe headaches after exerting himself that lasted two to three days and that he would have to rest in bed in the dark during these headaches.  He stated that he felt pain forcing him to take pain pills after a couple hours of work or heavy lifting.  He reported seeing red when his left eye was stressed.

Plaintiff described himself as feeling lost and useless because he had not been able to return to his prior work as a logger.  He also described that he was less social and active, that he stayed at home most of the time and avoided friends, and that he became irritated when asked about his eye.  He reported chronic frustration stemming from his loss of work and social functioning.

Plaintiff identified his daily activities to include cooking and playing with his children inside.  He explained that he typically woke up around 5:30 a.m. to spend a few hours outside until the light became too bright.  He further explained that after dusk he would return to work outside.  He stated that he had difficulty sleeping.

Dr. Fechter observed that Plaintiff was cooperative, with an appropriate affect, normal motor activity and speech, intact memory and thought process, unimpaired judgment and insight, and no evidence of hallucinations, delusions, or suicidal ideation. Dr. Fechter assessed a score of 29/30 on a mini-mental status evaluation, noting that Plaintiff's loss of one point in the Attention and Calculation score did not suggest cognitive impairment.  Dr. Fechter also assessed a Global Assessment of Functioning ("GAF") score of 45.[9]  Dr. Fechter determined that Plaintiff's mood was depressed and

---

[9] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v.*

anxious, and he reported that Plaintiff "cried deeply" when recounting his accident. (AR 832.) He noted that Plaintiff was unemployed, had inadequate finances, and had one prior conviction for marijuana cultivation. Dr. Fechter diagnosed chronic post-traumatic stress disorder and chronic pain disorder associated with both psychological factors and a general medical condition from his ruptured left eye, loss of iris, and photosensitivity.

In September 2011, non-examining state agency psychologist, Dr. Ellen Atkins, reviewed Plaintiff's medical record. She determined that Plaintiff had medically determinable impairments of a severe loss of visual acuity, a severe secondary retinal disorder, severe glaucoma, severe anxiety disorders, and severe somatoform disorders. She also determined that Plaintiff had a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no repeated episodes of decompensation.

Dr. Atkins found Plaintiff had "sustained concentration and persistence limitations." (AR 71.) This included moderate limitations with his ability to maintain attention and concentration for extended periods, as well as with his "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (AR 72.) This also included moderate limitations with his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and [with an ability] to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* She found no other significant limitations regarding the remainder of Plaintiff's potential sustained concentration and persistence limitations,[10] and she found that Plaintiff exhibited no

---

*Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)). A GAF score of 45 "indicates '[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job).'" *Parker v. Comm'r of Soc. Sec. Admin.*, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32).

[10] The assessment listed that Plaintiff was "[n]ot significantly limited" in his "ability to carry out very short and simple instructions," in his "ability to carry out detailed instructions," in his

"understanding and memory limitations," no "social interaction limitations," and no "adaption limitations." (AR 71-72.) She opined that Plaintiff's post-traumatic stress disorder and pain symptoms "undermine[d] cognitive efficiency," but she nonetheless concluded that he could sustain concentration, persistence, and pace over two-hour periods for a typical workday and workweek. (AR 72.)

In November 2011, another non-examining state agency psychologist, Dr. Joseph Patalano, reviewed Plaintiff's medical record. He offered the same assessment as Dr. Atkins regarding Plaintiff's medically determinable impairments and regarding Plaintiff's restrictions and difficulties of performing activities of daily living and maintaining social functioning, concentration, persistence, and pace. He also offered the same assessment as Dr. Atkins regarding Plaintiff's moderate sustained concentration and persistence limitations, as well as regarding Plaintiff's lack of memory or understanding limitations, social interaction limitations, and adaption limitations. Finally, he likewise noted that Plaintiff's post-traumatic stress disorder and pain symptoms "undermine[d] cognitive efficiency" but that Plaintiff could sustain concentration, persistence, and pace over two-hour periods for a typical workday and workweek. (AR 105.)

### E.    Plaintiff's Testimony at the January 3, 2013 Hearing.

Plaintiff testified that his light sensitivity began after the February 2010 accident. He described that on a daily basis he wakes early in the morning and "putter[s] around the house" doing "daily mundane stuff" until the sun rises and that he then returns inside until the sun sets. (AR 42.) He explained that he spends the day inside trying "to do things around the house." *Id.* He also stated that he listens to audio books, the television, and the radio, but does not actually watch a lot of television. He testified that he changed all the lights in his house to 25 and 40 watt bulbs and covered some of his windows in order to reduce the brightness inside. He described his house as like a cave, but that it is

---

"ability to sustain an ordinary routine without special supervision," in his "ability to work in coordination with or in proximity to others without being distracted by them," and in his "ability to make simple, work-related decisions." (AR 71-72.)

still too bright inside "at times." (AR 46-48.) He stated that twenty minutes in Home Depot caused headaches and anxiety because it was "just so glossy bright." (AR 47.)

Plaintiff testified that if he stayed out of the light or kept it to a minimum, while being cautious about his daily work, he could "still accomplish a few things" but without "longevity." (AR 41.) He explained that he could keep his environment only so dark, because the darkness affected his ability to see with his right eye, but that the "amount of light to be able to, to actually see and function normally, . . . just adds up." *Id.* He testified that an eye patch had not been effective because it could not reduce all light to his left eye and because it caused dryness, pain, and "seeing reds and blues and little swirling lights." *Id.* He also testified that sunglasses had not been effective because it remained too bright outside in the sunlight and that sunglasses had not been effective in other lighting conditions because it made it too hard to "see to function to do anything." (AR 43.) When asked about glasses with a blacked-out lens for his left eye, he answered that he had tried these glasses, but that they "thr[ew]" off his "perception" and he was constantly "trying to take [them] off" because his left eye was "still dominant." *Id.*

Plaintiff testified that his ability to drive had also been impacted. He stated that he could not drive during the daylight hours due to the sunlight and that he could drive at night only if he "didn't get flashed by too many lights." (AR 40.) Headlights impeded his ability to drive at night. He also explained that his perception is "off" with his left eye and that he would see double while driving. These problems impacted his ability to attend vocational rehabilitation, and Plaintiff's wife often drove him to his appointments.

Plaintiff testified that the wind, cold, and heat aggravated his left eye. He explained that his attempt to return to work as a logger caused headaches and that immediately following the accident, lifting a gallon of milk would trigger a headache. He stated that although he was "quite a bit stronger," there was "no way" he could lift, carry, or tug thirty-five or fifty pounds. (AR 44.) He stopped lifting weights because that activity caused headaches as well. He testified that, if he limited himself to minimal work in minimal light, he could go a week without a headache but any additional work for two to three hours caused headaches that lasted two to three days. He also stated that

17

he would from time to time get headaches even after "being reasonably careful." (AR 46.)

Plaintiff testified that the "only thing" that worked to cure his activity-induced headaches was to lie down in a dark room. (AR 40.) He testified that narcotics were ineffective for pain relief and that he was uncomfortable taking them on a regular basis. He further testified that the accident to his left eye caused anxiety, particularly because he is left-handed and left-eye dominant, and that he has trouble being around people since the accident. He stated he has trouble with focus and concentration, but that marijuana helped him focus and was effective for his anxiety. He also stated that he visits a counselor with his family every week or every other week because he could not "hold it all in" following the accident and that he thought this was helping. (AR 48-49.)

## III.    The ALJ's Application of the Five-Step Sequential Evaluation Process.

In order to receive benefits, a claimant must be "disabled"[11] on or before his or her "date last insured" under the Social Security Act. 42 U.S.C. § 423(a)(1)(A). The Social Security Administration regulations outline the following "five-step, sequential evaluation process used to determine whether a claimant is disabled":

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

---

[11] Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(1)(A).

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.

§§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v)).  "The claimant has the general burden

of proving that he or she has a disability within the meaning of the Act, and bears the

burden of proving his or her case at steps one through four of the sequential five-step

framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128

(2d Cir. 2008) (internal quotation marks omitted).  At step five, "the burden shift[s] to the

Commissioner to show there is other work that [the claimant] can perform." *McIntyre*,

758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

 In this case, the ALJ determined that Plaintiff meets the "insured status

requirements" of the Social Security Act through June 30, 2013, and that Plaintiff has not

engaged in substantial gainful activity since February 14, 2010.  (AR 15.)  At step two

and three, the ALJ found that Plaintiff has two severe impairments—a left eye

impairment and anxiety—but that Plaintiff does not have an impairment or combination

of impairments that meets or medically equals the severity of any listed impairment.  At

the fourth step, the ALJ determined Plaintiff's RFC allows him:

> [T]o perform light work . . . except he can lift, carry, push, or pull 20
> pounds occasionally and 10 pounds frequently.  [Plaintiff] has no
> limitations with sitting, standing, and walking.  He must avoid climbing
> ladders, ropes, and scaffolds.  He must avoid hazards such as unprotected
> heights and dangerous moving machinery.  [Plaintiff] must avoid even
> moderate exposure to dust, odors, fumes, gases, and poor ventilation.  He
> must avoid an environment where work is performed in the sunlight.
> [Plaintiff] is limited to uncomplicated tasks, which are defined as those that
> can be learned in 30 days o[r] less.  He can persist[] at tasks, concentrate,
> and stay on pace for two-hour blocks of time consistent with regularly
> scheduled breaks.  [Plaintiff] must avoid tasks requiring binocular vision.

(AR 17.)  Based on Plaintiff's RFC for light work with the listed limitations, the ALJ

determined that Plaintiff is unable to perform any past relevant work as a logger or

assembler of railroad cars, which are both classified as heavy exertional work, or as a

carpenter, which is classified as medium exertional work.  Finally, at the fifth step, the

ALJ concluded that there are significant jobs that exist in the national economy that

Plaintiff can perform in light of his age, education, work experience, and RFC.

## IV.   Conclusions of Law and Analysis.

### A.   Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Even if a court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for the Commissioner's. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Secretary of HHS*, 728 F.2d 588, 591 (2d Cir. 1984).

### B.   Plaintiff's Challenges.

Plaintiff primarily challenges the ALJ's RFC determination, arguing that the ALJ failed to consider and include limitations stemming from his light sensitivity and the severity and frequency of his pain and headaches. Plaintiff argues that the ALJ, in turn, failed to consider how these limitations would impact Plaintiff's ability to concentrate and focus and whether he would have to take additional breaks during a workday and absences from work due to those limitations and any attendant treatment and appointments. Finally, Plaintiff argues the ALJ improperly assigned minimal weight to the opinions of his treating physicians, while according substantial weight to agency consultants.

The Commissioner responds that the ALJ properly evaluated and fully accounted for each of Plaintiff's relevant limitations in her RFC assessment and that substantial evidence in the record supports that assessment.

### C.    Whether Substantial Evidence Supports the ALJ's RFC Finding.

Pursuant to Social Security Ruling 96-8P, "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," which "means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*," and any RFC assessment requires consideration of "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id.*

The ALJ "'must first identify [an] individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis,'" as listed in 20 C.F.R. §§ 404.1545 & 416.945. *Cichocki*, 729 F.3d at 176 (quoting SSR 96-8P, 1996 WL 374184, at *1). These functions "include":

> [P]hysical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors.

*Cichocki*, 729 F.3d at 176. An RFC is "expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy," that are outlined in 20 C.F.R. § 404.1567. SSR 96-8P, 1996 WL 374184, at *1. The ALJ in this case found a "physical exertion requirement[]" of light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the

time with some pushing and pulling of arm or leg controls.  To be
considered capable of performing a full or wide range of light work, you
must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).  Pursuant to Social Security Ruling 83-10, frequent "means
occurring from one-third to two-thirds of the time."  SSR 83-10, 1983 WL 31251, at *6
(Jan. 1, 1983).  "The full range of light work requires intermittently standing or walking
for a total of approximately 6 hours of an 8–hour workday, with sitting occurring
intermittently during the remaining time."  *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir.
2009).

      To assess functional limitations or restrictions and a claimant's RFC, an ALJ must
consider "all the relevant evidence" in the record.  20 C.F.R. § 404.1545(a).  This
includes a claimant's own statements, any descriptions or observations by other sources,
and all "relevant medical" evidence, such as a claimant's "complete medical history,"
medical reports, statements by "medical sources," and any "formal medical
examinations" or consultative examinations.  *See* 20 C.F.R. § 404.1545(a)(3); 20 C.F.R.
§ 404.1512(d)(2); 20 C.F.R. § 404.1513(a), (b), (d); *see also* 20 C.F.R. § 404.1512(b)
(directing that relevant evidence includes objective medical evidence, such as observable
anatomical abnormalities; evidence from medical sources, such as medical history,
opinions, and statements about treatment; and any statements from a claimant or others to
medical sources during the course of examination or treatment).

      As part of her analysis of Plaintiff's physical RFC, the ALJ concluded the record
did not support Plaintiff's allegations of severe and constant pain and headaches because
Plaintiff had denied pain at times during his treatment and because Plaintiff's most severe
symptoms were triggered only when Plaintiff attempted heavy work.  On this basis, the
ALJ concluded that Plaintiff's pain symptoms would not be triggered by light work as
provided in her RFC determination.  Plaintiff argues that the ALJ assumed too narrow a
focus in rejecting his complaints regarding, and the causes of, his pain and headaches and
that substantial evidence in the record reveals that his headaches, photosensitivity, and
other symptoms were not necessarily solely triggered by heavy exertional work.

Prior to attempting to return to his work as a logger, Plaintiff reported constant headaches in June of 2010, and headaches after his September 2010 surgery. In November of 2010, Plaintiff reported to Dr. Phipps that he experienced headaches that started over his left eye, occurred two to three times per week, and lasted two days, and in December of 2010, he reported to Dr. Young "bad headaches from his eye." (AR 368.) Plaintiff attempted to return to logging in January of 2011, which triggered "excruciating" headaches and pain. (AR 462, 571.) At the same time, he reported that "everything" seemed to bother his left eye and that he was fine only when he did not "do anything." (AR 434.) His pain subsided only when he had been taking "it easy a lot." (AR 428.) In March of 2011, he confirmed that he had not worked over the past month and that his pain had mostly subsided, except for feelings of pressure, heaviness, and cloudiness in his left eye. By July of 2011, however, he reported that lowering his head, as well as working, bending, or lifting for only one hour, caused aching and pounding in his eye that subsided after one or two hours if he rested. He continued to report that merely leaning or bending over triggered pain and headaches. In November of 2011, Plaintiff reported chronic pain, dryness, and soreness that impacted his ability to do "any kind of work." (AR 864.) In March of 2012, Plaintiff reported that he experienced no pain or aching only when he was not in the light or trying to work.

Accordingly, Plaintiff's reported symptoms when relayed to his treatment providers were consistent with his testimony before the ALJ that he lacked any "longevity" for work, even when he "very carefully" tried to manage his daily activities, and that he often experienced headaches, light sensitivity, issues with perception, and other symptoms. (AR 41.) None of Plaintiff's treatment providers reported any concern that Plaintiff was exaggerating his symptoms or otherwise malingering. The record as a whole thus supports a conclusion that Plaintiff's headaches and related symptoms were not triggered solely by heavy exertional work. Instead, even light and moderate activities were enough to cause Plaintiff to suffer symptoms stemming from his left eye that interfered with his ability to do work. *See* 20 C.F.R. § 404.1529(a) (directing an ALJ to consider whether "related symptoms affect [the] ability to work"). The ALJ's conclusion

that light work would not trigger Plaintiff's most severe and frequent symptoms and that those symptoms would not interfere with ability to work for a normal workday during a normal workweek thus reflects a "misreading of the evidence" in the record. *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) (remanding because a "misreading of the evidence" does not comport with the ALJ's obligation to consider all of the relevant evidence in the record).

The ALJ also found that the severity and frequency of Plaintiff's subjective complaints of pain were not consistent with his course of treatment because Plaintiff decreased and even stopped using pain medication. An ALJ may not "impose" the "notion" that the severity of an impairment and its symptoms "directly correlates" with the intrusiveness of medical treatment. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (internal quotation marks omitted). The ALJ should focus on "other substantial evidence in the record, such as the opinions of other examining physicians[,]" to ascertain Plaintiff's allegations of symptoms, including pain, despite a course of conservative treatment. *Id.* In addition, a claimant may refuse a course of treatment if a claimant has "a good reason" to do so. 20 C.F.R. §§ 404.1530(b), (c) & 416.930(b), (c). Thus, evidence of treatment received or declined by Plaintiff is relevant to determining his disability pursuant to 20 C.F.R. § 404.1512 and 20 C.F.R. § 404.1530. However, in discrediting Plaintiff's subjective symptoms of pain and headaches, the ALJ failed to acknowledge that Plaintiff proffered a reason for his desire to avoid narcotic medication, which Dr. Sher supported because it exposed Plaintiff to addition risks, as well as that Plaintiff explained that his headaches could last for days unless he was able to lie down in the dark. *Cf. Aubeuf v. Schweiker*, 649 F.2d 107, 114 n.9 (2d Cir. 1981) (noting that pursuant to the regulations a claimant could have a good reason to reject a medication when it was ineffective and caused negative side effects).[12]

---

[12] The ALJ referenced Plaintiff's use of marijuana and noted that Plaintiff found marijuana helpful for treating his anxiety and focus. *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(v) (requiring to evaluate the intensity and persistence of symptoms consideration of the type, dosage, effectiveness, and side effects of any medication and any treatment in addition to medication). While Plaintiff contends that the ALJ also erred by failing to consider the effects of marijuana

Finally, as part of her analysis of Plaintiff's physical RFC, the ALJ also concluded the record did not support Plaintiff's allegations of light sensitivity. The ALJ evaluated Plaintiff's testimony regarding his daily activities to conclude that the record failed to support his alleged inability to work due to light sensitivity and that his "ability to perform [his daily activities] is generally consistent with an ability to perform a range of light exertion work performed outside of direct sunlight." (AR 19.) The ALJ determined that Plaintiff could work if he "avoid[ed] an environment where work is performed in the sunlight." (AR 17.)

This conclusion, however, failed to reflect that there was substantial evidence in the record that Plaintiff was "very photophobic" and had "severe photophobia," which his treating physicians, including Dr. Phipps and Dr. Fynn-Thompson, diagnosed and accommodated by examining Plaintiff in low lighting conditions, which was an atypical examination setting. (AR 675, 826, 845, 853.) Plaintiff further testified that he could only perform activities in a darkened environment, which imposed obstacles as it impacted his ability to see with his right eye. The ALJ's RFC analysis, however, is bereft of any consideration of whether a work environment of this nature would be feasible. Notably, the vocational expert testified that "most workplaces have fairly strong lighting so people can see what they're doing," (AR 54), and Plaintiff himself explained that indoor lighting at Home Depot triggered pain within twenty minutes because of the "glossy bright" light inside. (AR 47.)

In rejecting Plaintiff's complaints of light sensitivity and glare, the ALJ relied solely on Plaintiff's reported daily activities, which included minimal work indoors during the day and outdoors at dawn and dusk. The ALJ's reliance on Plaintiff's reported daily activities, however, fails to account for the actual conditions in which Plaintiff worked, both indoors and outdoors. Specifically, Plaintiff testified that he had made his home like a cave by covering windows and installing low-wattage bulbs and that he often

---

use in a workplace (Doc. 8-1 at 14), Plaintiff cites to no case law or social security ruling that indicates an ALJ should consider the use of medical marijuana with regard to Plaintiff's ability to perform physical and mental activities in a work setting on a regular and continuing basis.

had to keep lighting conditions so reduced inside his house to avoid impacting his left eye that he could not function because it was too dark. He said that "at times" these measures were not sufficient to account for his light sensitivity. (AR 46-47.) Plaintiff also explained that in order to work in brighter lighting conditions he had tried using an eye patch, sunglasses, and glasses with the left lens darkened but that these alternatives either caused dryness or soreness or did not block out enough light to address his light sensitivity. Finally, Plaintiff explained that the best cure for his symptoms was to lie down in the dark, which he could accommodate when he stayed at home all day. For these reasons, Plaintiff's sensitivity to lights and glare, supported by the medical observations and the conclusions of his treating physicians, is a relevant limitation on his work-related abilities as it has a direct impact on the work environments which will be able to offer him light work while accommodating his restrictions.

The court, therefore, agrees with Plaintiff that the ALJ failed to conduct a "thorough examination" of Plaintiff's "relevant limitations and restrictions" to determine his physical exertion requirements and whether any "specified modifications" were necessary. *Cichocki*, 729 F.3d at 178. The RFC determination, therefore, does not list "all" of Plaintiff's functional limitations or restrictions stemming from his vision impairment that impacts his "work-related abilities." *Id.* at 176, 178. Remand is therefore "appropriate" on this basis alone. *Id.* at 177 (directing that remand is "appropriate" when "an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review"); *see also Poupore*, 566 F.3d at 306 (noting remand is appropriate when there is a reasonable basis to doubt whether the ALJ applied the correct legal principles).

Because the ALJ failed to identify all relevant limitations and restrictions in the first instance, the court does not address Plaintiff's further argument that the ALJ also failed to consider whether these limitations and restrictions, as well as medical appointments to address his impairment, would have necessitated breaks during the workday and work absences, as well as whether these limitations and restrictions would

26

have undermined his ability to maintain persistence, concentration, and pace. On remand, however, the ALJ should reevaluate any findings on these issues following a redetermination of Plaintiff's functional limitations and restrictions. *See* 20 C.F.R. §§ 404.1545(a) & 416.945 (a) (requiring consideration of whether impairments and "related symptoms" cause "mental limitations that affect what [a claimant] can do in a work setting," as well as the claimant's "ability to meet the physical, mental, sensory, and other requirements of work"); *see also* SSR 96-8P, 1996 WL 374184, at *1 (directing an ALJ to consider, *inter alia*, the "effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)").

### D.    Whether the ALJ Violated the Treating Physician Rule.

The ALJ's failure to fully account for Plaintiff's relevant limitations and restrictions stemming from his visual impairment is further compounded by the ALJ's failure to comply with the treating physician rule, which mandates that the opinions of treating physicians are "binding if . . . supported by medical evidence and not contradicted by substantial evidence in the record." *Selian*, 708 F.3d at 418; *see also Burgess*, 537 F.3d at 128 ("[T]he [Social Security Administration] recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]") (internal quotation marks omitted). To weigh these opinions, an ALJ must consider, *inter alia*, the length, frequency, nature, and extent of the treatment relationship; the consistency of the opinion offered with the "record as a whole"; and whether the opinion is "of a specialist about medical issues related to his or his area of specialty." 20 C.F.R. §§ 404.1527(c)(2), (4), (5) & 416.927(c)(2), (4), (5). In accordance with these regulations, the ALJ must provide "good reasons" regarding "the weight" given to a treating physician's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1513 (listing "acceptable medical sources").

In this case, the ALJ assigned "minimal weight" to the specific opinions of Dr. Lichtenstein and Dr. Phipps regarding Plaintiff's ability to maintain concentration,

persistence, and pace, as well as whether and how often he would need to take unscheduled breaks during a workday or would be absent from work, while she assigned "significant weight" to the opinion of non-examining Dr. Atkins on those same issues. (AR 20-21.)[13]  In doing so, the ALJ failed to offer any consideration of the opinions and diagnoses of Plaintiff's treating physicians regarding the trauma to his eye and how that trauma affected his left eye's tolerance of light and further failed to explain why the ALJ was impliedly rejecting those opinions.

Plaintiff consistently reported experiencing sensitivity to light and glare, complaints that are supported by objective medical evidence in the record. Dr. Fynn-Thompson, Dr. Phipps, Dr. Lichtenstein, Dr. Sher, and Dr. Young determined that Plaintiff's iris is abnormal, nonfunctional, and almost entirely missing, which Dr. Fynn-Thompson, Plaintiff's surgeon, concluded precludes reconstructive surgery of his pupil. Dr. Fynn-Thompson, Dr. Phipps, Dr. Lichtenstein, and Dr. Sher further determined that his left pupil is irregular, non-reactive, and, without surgery, cannot constrict to block light.  Dr. Phipps, Dr. Haight, and Dr. Fynn-Thompson diagnosed that Plaintiff was "very photophobic."  (AR 675, 826, 854.)  Dr. Phipps, an ophthalmologist, explained that "the fact that there is no iris tissue to block light has resulted in extreme light sensitivity and photophobia[]."  (AR 418.)  He further determined that Plaintiff's symptoms associated with his eye trauma included "[d]ebilitating glare due to aniridia [and] severe photophobia" (AR 845) and that Plaintiff could not tolerate bright light or normal lighting

---

[13] The court has declined to address Plaintiff's challenges to the ALJ's findings regarding Plaintiff's mental abilities in the workplace, breaks during a workday, and work absences so that the ALJ can reevaluate those specific findings after the ALJ has fully considered in the first instance Plaintiff's specific limitations and restrictions stemming from his visual impairment. It appears, however, the ALJ correlated Plaintiff's cognitive abilities, as expressed in the mini-mental health examination, with his ability to maintain concentration, persistence, and pace. In contrast, Plaintiff argues his symptoms of pain, headaches, and light sensitivity undermine his ability to maintain concentration, persistence, and pace. He points out that Dr. Lichtenstein and Dr. Phipps opined that Plaintiff's pain would "often" or "constantly" interfere with his ability to concentrate. (AR 843, 845.) Indeed, Dr. Atkins and another state agency consultant agreed that Plaintiff's post-traumatic stress disorder and pain symptoms undermined his "cognitive efficiency." (AR 72, 105.)

conditions due to severe photophobia caused by the "absence of iris, low-grade uveitis, and keratopathy." (AR 845.)

Accordingly, there was both an observable anatomical anomaly, the absence of Plaintiff's iris, as well as the opinions and statements about Plaintiff's treatment and symptoms by medical sources, that explained Plaintiff's complaints of sensitivity to light and glare. *See* 20 C.F.R. § 404.1512(b). There were no contradictory assessments of Plaintiff's left eye and its correlation with his reported sensitivity to lights and glare. The treating physician' opinions were therefore "supported by medical evidence and not contradicted by substantial evidence in the record." *Selian*, 708 F.3d at 418. The ALJ, however, offered no explanation for the failure to consider the opinions and diagnoses of Plaintiff's treating physicians in rejecting Plaintiff's reported symptoms and in finding the RFC's specified modifications would accommodate Plaintiff's visual impairment and related symptoms. *See* SSR 96-5P, 1996 WL 374183, at *2-3 (July 2, 1996) (directing that an ALJ "must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner," by analyzing the "applicable factors" under 20 C.F.R. §§ 404.1527 & 416.927). The ALJ's failure to provide "good reasons" for rejecting these opinions thus necessitates a remand. *Selian*, 708 F.3d at 419; *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (remanding "to allow the ALJ to reweigh the evidence" and "develop[e] the record as may be needed" because the ALJ "failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion").

## V.   Conclusion.

For the foregoing reasons, the court finds that the ALJ's RFC assessment is not supported by substantial evidence in the record and does not address all relevant limitations and their impact on Plaintiff's work-related abilities. A remand is therefore necessary for redetermination of Plaintiff's functional limitations and restrictions and whether he remains capable of an RFC of light work notwithstanding these limitations and restrictions. *See Cichocki*, 729 F.3d at 176. In performing this analysis, the ALJ must provide "good reasons" if the ALJ determines that the opinions of Plaintiff's

treating physicians must be rejected.  The Commissioner then bears the burden of demonstrating that there remains relevant work for Plaintiff to perform.  *See McIntyre*, 758 F.3d at 150.

The court therefore GRANTS Plaintiff Alfred George Anair's motion for an order reversing the Commissioner's decision (Doc. 8), REVERSES the decision dated February 11, 2013, and REMANDS for further proceedings pursuant 42 U.S.C.A. § 405(g).  *See* 42 U.S.C.A. § 405(g).  The court DENIES Defendant's motion for an order affirming the Commissioner's decision.  (Doc. 12.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 26th day of August, 2015.

Christina Reiss, Chief Judge
United States District Court